# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

**Tamara L. Giwa**
*Executive Director*

**Michelle A. Gelernt**
*Attorney-in-Charge*

---

July 15, 2025

<u>BY ECF</u>

The Hon. Eric Komitee
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

                Re:    *United States v. Bilal Nagi*, No. 23 Cr. 524 (EK)

Your Honor:

      This office represents Bilal Nagi. We respectfully submit this letter in connection with Mr. Nagi's sentencing, currently scheduled for August 5, 2025, at 2:30 p.m.

## I.    PRELIMINARY STATEMENT

      On February 6, 2025, Mr. Nagi pleaded guilty before Judge Merkl to Count One of the indictment, charging kidnapping in violation of 18 U.S.C. § 1201(a)(1). We request a non-Guidelines sentence of imprisonment of 144 months, or 12 years.

      No sentencing factor warrants harsher punishment. The kidnapping here was serious—it targeted Mr. Nagi's 17-year-old co-conspirator in previous robberies and involved humiliating the victim by stripping and filming him—but there is insufficient competent evidence to establish that the grave sexual abuse belatedly alleged by the victim actually occurred. The nature and circumstances of the offense therefore do not counsel for a sentence years and years higher than sentences for comparable kidnappings—notwithstanding the very high undisputed advisory Guidelines range—even accounting for Mr. Nagi's criminal history.

      Moreover, Mr. Nagi faces deportation to Yemen after his jail sentence is completed. This fact alone warrants a substantial downward variance. Mr. Nagi bears significant trauma (and, indeed, a PTSD diagnosis) from the violence and death he experienced growing up in Ibb, a province "[o]nce dubbed Yemen's 'hotbed of infighting,'" which still "continues to harbor considerable instability," including "[r]ampant crime and a string of revenge killings," "repression and political disorder," and "simmering turmoil." ACLED, "A barometer of Houthi

repression: Governance and infighting in Ibb governorate" (Mar. 4, 2025).[1] Mr. Nagi has no remaining life there, and no prospects for anything good upon his return.

Indeed, as discussed below, he will likely face death after deportation, should the Court accept either the unfounded allegations of the victim here or the government's spurious legal position that kidnapping triggers SORNA registration requirements whenever the victim is a minor. Any signal (albeit false) that Mr. Nagi was a sex offender in these respects would mark him as a target for the anti-homosexual violence that is endemic to the region. For the reasons set forth below, the Court should find that the record evidence is insufficient to support the victim's sex abuse allegations and that Mr. Nagi is not subject to SORNA requirements as a matter of law.

## II.  BACKGROUND

### A.  The Offense Conduct Did Not Involve The Alleged Sex Abuse

Mr. Nagi has pleaded guilty to kidnapping, and the defense does not dispute the victim was "sexually exploited" within the meaning of U.S.S.G. § 2A4.1(b)(5). As a legal matter, the stripping of the victim's pants—which was captured on video and intended to humiliate—necessarily involved "the intentional touching, either directly or through the clothing, of the genitalia," "groin," or "inner thigh," and thus technically constitutes "sexual contact" under 18 U.S.C. §§ 2246(3) & 2244; *see* U.S.S.G. § 2A4.1 app. n.3 (incorporating the "abusive sexual contact" offense and relevant definition).

But there is insufficient evidence to establish that "Nagi forcibly inserted his fingers into John Doe's anus, causing John Doe pain," as the PSR asserts. (*See* PSR ¶¶ 7, 15, 19). The defense has seen no video depicting that sexual conduct, John Doe did not report it to the police (*see* PSR ¶ 8), we are not aware that he complained of the alleged violence or pain to medical professionals (*see id.*), and despite being the government's complainant in this case, John Doe has neglected to submit a sworn affidavit attesting to any psychological or physical injury from the alleged sexual act (*see* PSR ¶ 13). Notably, the government's response to this objection to the PSR does not dispute that there exists zero corroboration for the victim's belated allegation.

Moreover, John Doe has a revenge-based motive to fabricate the alleged sexual act, because, as discussed below, should Mr. Nagi be found to have committed it, Mr. Nagi would be subject to potential violence and even death upon his eventual deportation to Yemen. Indeed, Mr. Nagi has already been subject to threats of violence at MDC Brooklyn in light of the unproven sexual abuse charges. We therefore object to the inclusion of John Doe's allegation as a fact in the sentencing record.

---

[1] *At*: https://acleddata.com/2025/03/04/a-barometer-of-houthi-repression-governance-and-infighting-in-ibb-governorate/.

### B.     Mr. Nagi Will Be Deported to Yemen After His Release

Mr. Nagi will be deported to Yemen following the completion of his federal prison sentence. As kidnapping is an aggravated felony for INA purposes, his removal is presumptively mandatory. These collateral consequences will be far harsher than any jail sentence.

Mr. Nagi grew up in Ibb, Yemen. The province was chaotic, even before the current civil war. Mr. Nagi describes his childhood as "the worst years of [his] life." (PSR ¶ 52). He saw several family members and friends die in front of him. On one occasion, Mr. Nagi witnessed his friend's legs blown off in a bombing. On another, he watched a friend pick up an item that turned out to be an explosive device—it detonated in his friend's hand.

Mr. Nagi and his family were able to relocate to the United States in 2013 and 2014, but he has carried the trauma with him into adulthood. He has been formally diagnosed with post-traumatic stress disorder (PTSD) and depression, for which he takes anti-psychotic and depression medication. (PSR ¶ 62). Before having access to prescription medication to address these ongoing mental health issues, Mr. Nagi self-medicated with khat and marijuana. (PSR ¶ 65).

Mr. Nagi now faces the prospect of deportation back into the same violence that gave rise to his trauma. He will be separated from his family and any support, and his prospects in Yemen are bleak, even if he is not targeted for violence by an erroneous finding that he is somehow a sex offender.

## III.    APPLICABLE SENTENCING LAW

### A.     The Sentencing Scheme

A sentencing court is required to consider the factors set forth in 18 U.S.C. § 3553(a) in determining a reasonable sentence in each individual case. *See United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38, 49-50 (2007). Section 3553(a) directs that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in Section 3553(a)(2)]," which in turn sets forth that the applicable purposes are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)   to afford adequate deterrence to criminal conduct;
(C)   to protect the public from further crimes of the defendant; and
(D)   to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

To arrive at such a sentence, the Court is further directed to consider these additional factors set forth in Section 3553(a): (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established; (5) pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need to provide restitution. In every case, the sentencing court "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50.

The defense does not object to the PSR's Guidelines calculation. However, the Guidelines range is just one of several factors set forth in Section 3553(a) that a district court must consider when imposing sentence. *See also Pepper v. United States*, 131 S. Ct. 1229, 1241 (2011). A sentencing court "has broad latitude to 'impose either a Guidelines sentence or a non-Guidelines sentence.'" *United States v. Rigas*, 583 F.3d 108, 114 (2d Cir. 2009) (citation omitted).

### B.     Mr. Nagi Is Not Subject to SORNA Requirements

The sole legal issue for the Court to answer in this case is whether the requirements of the Sex Offender Notification and Registration Act (SORNA) apply to Mr. Nagi's offense of conviction. The PSR asserts that they do. (PSR ¶ 91). The government says so too. They are both wrong.[2]

#### 1.     Mr. Nagi Was Not "Convicted of a Sex Offense."

The general SORNA registry requirements stem from 34 U.S.C. § 20913(a), which applies to "[a] sex offender." The definition of "[t]he term 'sex offender'" is found in 34 U.S.C. § 20911(1): it is "an individual who was convicted of a sex offense." The definition of the term "sex offense," in turn, is found in 34 U.S.C. § 20911(5)(A), which, in relevant part, includes "(i) a criminal offense that has an element involving a sexual act or sexual contact with another;" and "(ii) a criminal offense that is a specified offense against a minor." As to the latter provision, the statute further defines "specified offense against a minor" as follows:

> Expansion of definition of "specified offense against a minor" to include all offenses by child predators
>
> The term "specified offense against a minor" means an offense against a minor that involves any of the following:
>
> (A) An offense (unless committed by a parent or guardian) involving kidnapping.

---

[2] The PSR does not cite or refer to the applicable statute governing who is subject to sex offender registration. The statute that the PSR cites—18 U.S.C. § 4042 (*see* PSR ¶ 91)— sets out "Duties of [the] Bureau of Prisons," and the specific provision cited—section 4042(c)—establishes BOP's notice obligations with respect to "release of prisoners" who are "required to register under the Sex Offender Registration and Notification Act." It does not, and does not purport to, establish what those SORNA requirements are, or to whom they are subject.

4

(B) An offense (unless committed by a parent or guardian) involving false imprisonment.
(C) Solicitation to engage in sexual conduct.
(D) Use in a sexual performance.
(E) Solicitation to practice prostitution.
(F) Video voyeurism as described in section 1801 of Title 18.
(G) Possession, production, or distribution of child pornography.
(H) Criminal sexual conduct involving a minor, or the use of the Internet to facilitate or attempt such conduct.
(I) Any conduct that by its nature is a sex offense against a minor.

34 U.S.C. § 20911(7).

Mr. Nagi was not "convicted of a sex offense" under these definitions, because his offense of conviction does not by its terms have "an element involving a sexual act or sexual contact with another," and it is not "a specified offense against a minor."

Mr. Nagi was convicted only of kidnapping, specifically, kidnapping of a person willfully transported in interstate commerce, in violation of 18 U.S.C. § 1201(a)(1). There is no element involving a sexual act or contact in this crime. Nor was Mr. Nagi convicted of the any of the "certain offenses involving children" separately provided for by "special rule" in the kidnapping statute. *See* 18 U.S.C. § 1201(g) (requiring proof that victim was under 18 years old, offender was over 18 years old and not a relative or similar person, and penalty enhanced to a 20-year mandatory minimum).

Mr. Nagi was therefore not convicted of any of SORNA-specified "offense against a minor," whether an offense against a minor "involving kidnapping," or any other offense specified by 34 U.S.C. § 20911(7).

### 2. SORNA Calls for a Categorical Approach, Not a Factual Inquiry.

In its response in support of the PSR's suggested imposition of SORNA requirements, the government observes that the victim was, in fact, a minor. But that fact is not germane to the analysis here, which is categorical, not factual.

Start with the text. SORNA by its terms applies to individuals "convicted of a sex offense." 34 U.S.C. § 20911(1). As a matter of plain language, the phrase "convicted of a sex offense" refers to the statutory offense of conviction, not the factual scenario in which the offense was committed. The statutory text thus calls for a "categorical approach," which looks to whether the offense qualifies, not whether the offense conduct qualifies. *See Moncrieffe v. Holder*, 569 U.S. 184 (2013) (applying the "categorical approach" to the INA because that statute "asks what offense the noncitizen was 'convicted' of, not what acts he committed," and reaffirming that the term "'[c]onviction' is 'the relevant statutory hook'" (citation omitted)); *Taylor v. United States*, 495 U.S. 575, 600–01 (1990) (observing that "the language" of ACCA supports a categorical approach because it "refers to 'a person who . . . has three previous

5

convictions' for—not a person who has committed—three previous violent felonies or drug offenses").

The statutory context supports this conclusion. As Judge Wood has observed, the "function[s] of SORNA" are similar to the functions of ACCA, which is indisputably analyzed with a categorical approach, "in that they both subject a defendant to an enhanced penalty (or obligation) if the defendant's prior conviction(s) meet the enhancing statute's requirements." *United States v. George*, 223 F. Supp. 3d 159, 165-66 (S.D.N.Y. 2016). The government offers no reason why statutes so similar in function should nonetheless call for different analytical approaches to determining whether prior convictions qualify as predicates.

Next, SORNA's legislative history, on balance, bolsters the conclusion that a categorical approach was intended by Congress. *See Taylor*, 495 U.S. at 600–01 (looking to ACCA's legislative history as further support for categorical approach indicated principally by statute's language). On the one hand, while "the Congressional record" makes "apparent" that legislators wanted SORNA's reach to be "expansive," "it is not clear the legislators made the general remarks about its broad application with the narrow issue [of the categorical approach] in mind." *United States v. Piper*, No. 1:12-CR-41-JGM-1, 2013 WL 4052897, at *10 (D. Vt. Aug. 12, 2013). That legislative purpose is inconclusive. However, "[a]nother purpose of SORNA" reflected by the legislative history was "to unify state registration systems," which, before SORNA, "consisted of a patchwork of federal and 50 individual state registration systems." *Id.* (citation omitted). The "elemental," *i.e.*, categorical, "approach . . . better serves uniformity," and thus is supported by this branch of the legislative history. *Id.*

Finally, a fact-specific approach to determining what constitutes a sex offense would face "the practical difficulties and potential unfairness" that counseled against a factual approach in determining ACCA predicates. *Taylor*, 495 U.S. at 601. For example, the same proof problems and potential for abridgment of the jury trial right would apply here if a court were to have to examine the factual record (if any) of a defendant's past crimes to determine if SORNA applies. *See id.* Moreover, there is the same potential for unfairness to a defendant when "a guilty plea to a lesser . . . offense was the result of a plea bargain," yet a "sentence enhancement"—here, a registration requirement—is imposed "as if the defendant had pleaded guilty to [the more culpable offense.]" *Id.* As with ACCA, the Court should assume here that Congress did not intend such a plea-adverse policy. See *id.* Yet Mr. Nagi would be subject to precisely that unfairness if the Court were to determine that SORNA applied notwithstanding his plea to kidnapping only, and not to the more culpable offense of kidnapping of a minor.

### 3. The Ninth Circuit's Analysis Is Mistaken.

The government resists the categorical approach, citing *United States v. Mi Kyung Byun*, 539 F.3d 982 (9th Cir. 2008), which held that a defendant's "conviction for importation of an alien for purposes of prostitution, 8 U.S.C. § 1328, makes her a 'sex offender' for purposes of SORNA" and that the court could look to the fact that her crime "was committed against a minor" to make that determination. *Id.* at 986. The Ninth's Circuit's analysis is mistaken.

*Mi Kyung Byun* followed the statutory construction approach laid out by *Taylor*, but arrived at a different conclusion, for four reasons: (1) the language of the separately provided "tier" category provision of SORNA "points strongly toward a non-categorical approach with regard to the age of the victim," because it applies to crimes "when committed against a minor;" (2) the statute's definition of "sex offender" distinguishes among, on the one hand, offenses having an "element involving a sexual act or sexual contact," which by its terms "requires an analysis of the statutory elements," and, on the other hand, "specified offense[s] against a minor," which do not reference "elements;" (3) the "specified offense against a minor" definition "begins with language stating that such offenses must be 'against a minor' and then lists offenses such as 'kidnapping'" and others "that do not refer to the identity of the victim," a structure the Ninth Circuit took to "suggest[] that *any* kidnapping offense becomes a 'specified offense against a minor' when the victim is a minor;" (4) a subcategory of specified offenses against a minor includes "[a]ny conduct that by its nature is a sex offense against a minor," which references conduct, not conviction; and (5) the legislative history shows an expansive intent. *Id.* at 990–93.

The principal problem with this analysis is that it minimizes the governing plain language of the text, which looks to whether the individual "was convicted of a sex offense." 34 U.S.C. § 20911(1). *Mi Kyung Byun* offers that this language is "somewhat more ambiguous" than the "tier" provisions. *Id.* at 992. But this fails to do the requisite justice to the statutory language. The Supreme Court has made clear (after *Mi Kyung Byun* was decided) that terms like "convicted" and "conviction" are "the relevant statutory hook" presumptively signaling a categorical approach. *Moncrieffe*, 569 U.S. at 191 (citation omitted).

Nothing in the Ninth Circuit's analysis overcomes this presumption.

*First*, that SORNA provides for tiers of offenders based upon conduct that was "committed," signaling a factual approach to those provisions in the government's view, counsels *against* interpreting the statute's separate reference to individuals "convicted" of a sex offense as mandating the same approach. It is a "principle of statutory interpretation" that "Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning." *United States v. Lockhart*, 749 F.3d 148, 153 (2d Cir. 2014), *aff'd*, 577 U.S. 347 (2016). The Ninth's Circuit's reasoning would collapse the word "committed" with the word "convicted," contrary to this principle.

*Second*, that the definition of "sex offense" in 34 U.S.C. § 20911(5)(A)(i) refers to "element[s]," whereas the definition of § 20911(5)(A)(ii) does not, does not mean that Congress reserved the categorical approach for § 20911(5)(A)(i) alone. Rather, it signals that, in the former provision, Congress intended to cast a wide net over all sex offenses—using the relevant "element" to do so—whereas in the latter Congress explicitly sought to "specif[y]" which "offenses against a minor" would also qualify—encompassing a range of disparate offenses without elements in common (for example, kidnapping and "video voyeurism"). 34

7

U.S.C. § 20911(7). That Congress chose to specify particular qualifying offenses of which individuals could be "convicted," 34 U.S.C. § 20911(1), hardly rebuts the presumption that the categorical approach applies.

*Third*, that the definition of "specified offense against a minor" in § 20911(7) "begins with language stating that such offenses must be 'against a minor'"—and then "lists offenses such as 'kidnapping'"—does not suggest that Congress intended courts to inquire whether the victim was a minor as a matter of fact. It is simply an efficient way to list offenses of conviction against minors, without having to repeat "of a minor" after every offense in the list. To avoid that superfluity, Congress subordinated the list of offenses that the "specified offense against a minor" must "involve[]" within a relative clause governed by the subject phrase "offense against a minor." That subject therefore determines and restricts the meaning of the listed offenses. *See In re China Fishery Grp. Ltd.*, No. 16-11895 (JLG), 2023 WL 2435701, at *11 (Bankr. S.D.N.Y. Mar. 8, 2023) (observing that a relative clause is "a dependent clause that cannot exist independent of the sentence's main subject" and interpreting text within relative clause in light of "the subjects of the overarching relative clause"). In other words, the text requires two things: first, that the qualifying offense be an "offense against a minor," and, second, that it involve one of the offenses listed.

Nothing in this syntactic choice requires, or even suggests, a factual approach to determine whether the offense was "against a minor." The text does not provide that the offense must have been *committed* against a minor. *See Taylor*, 495 U.S. at 600–01; *see also United States v. Hayes*, 555 U.S. 415, 418–21 (2009) (Congress's reference to a "crime . . . committed by a current or former spouse" signaled a factual approach to determining domestic-relationship requirement).[3] Nor does it refer to an offense *in which* a minor was the victim. *See Nijhawan v. Holder*, 557 U.S. 29, 32 (2009) (Congress's reference to "an offense . . . in which the loss to the victim or victims exceeds $10,000" signaled a factual approach to determining victim loss). Rather, the text simply makes clear that the definition encompasses only those crimes of conviction that are "against a minor," a clarification that is necessary because many of the listed specified offenses, like kidnapping, apply separately to adult and child victims.

*Fourth*, the reference to "conduct" in the provision encompassing "[a]ny conduct that by its nature is a sex offense against a minor" does not compel a factual approach here. In *James v. United States*, 550 U.S. 192 (2007), the Supreme Court applied the categorical approach to ACCA's residual clause defining a "violent felony" as including an offense that "otherwise involves *conduct* that presents a serious potential risk of physical injury to another." *Id.* at 196 (emphasis added). Nothing in ACCA's reference to "conduct" warranted a factual approach. The

---

[3] On the other hand, Congress does appear to have intended certain circumstance-specific safe harbors to involve a factual approach—this is a practical solution to the problem of statutory elements not reliably reflecting, for example, whether the defendant was a parent or guardian of the minor. *See, e.g.*, § 20911(7)(A) (providing for an exception if the offense was "committed by a parent or guardian").

Ninth Circuit does not address *James*. Nor does it address the canonical "rule of the last antecedent," pursuant to which a term "should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26–27 (2003). Under this rule, even if the word "conduct" in the final provision of the list of offenses requires a factual approach, that does not determine the meaning of all the previous offenses in the list.

*Fifth*, the Ninth Circuit's focus on the legislative history of SORNA is erroneously superficial. To be sure, Congress wanted the act to be expansive. But that does not militate for or against a categorical approach. *See Piper*, 2013 WL 4052897, at *10. And the Ninth Circuit entirely ignores the other "purpose of SORNA," which was "to unify state registration systems." *Id.* The categorical approach "better serves uniformity." *Id.*

\*    \*    \*

For these reasons, the Court should find that Mr. Nagi is not subject to SORNA's registration requirements.

### IV. ARGUMENT

A sentence of 144 months' incarceration is sufficient, but not greater than necessary, to comport with the purposes of sentencing in this particular case.

*First*, defendants in comparable kidnapping cases have received substantially lighter sentences. In *United States v. Joseph Davila,* 20-cr-292 (PKC) (S.D.N.Y.), for example, the defendant pled guilty to kidnapping and kidnapping conspiracy, in violation of 18 U.S.C. § 1201(a)(1) and 18 U.S.C. § 1201(c), for trapping the victim in a basement—in retaliation for the victim's conduct during a robbery—while physically abusing and humiliating the victim by making him undress, placing an electrical cord around his neck, and making him "walk like an ape" on his knees and knuckles. This defendant, who like Mr. Nagi committed the kidnapping while on supervision, was sentenced to 106 months imprisonment, below the applicable guidelines range of 121 to 151 months.

Similarly, in *United States v. Castillo*, 23-cr-279 (LTS) (S.D.N.Y.), a defendant who pleaded guilty to kidnapping conspiracy in violation of 18 U.S.C. §1201(c), having conspired to kidnap and assault of a 16-year-old involved in drug dealing, was sentenced to 84 months in prison, despite a Guidelines range of 168 to 210 months. (The defendant was not required to register pursuant to SORNA).

Other comparables: *United States v. Floyd,* 19-cr-194 (RPK) (defendant pleaded guilty to kidnapping conspiracy and Hobbs Act after a midday kidnapping and robbery of three victims, including a 16-month-old child; sentenced to 100 months' imprisonment despite a Guidelines range of 151 months to 188 months; no SORNA registration requirement imposed); *United States v. Simons*, 21-cr-009 (CBA) (defendant pleaded guilty to kidnapping in violation of 18 U.S.C. 1201(a)(1) after breaking into an apartment while posing as a UPS driver; sentenced to 78 months, despite a Guidelines range of 121 months to 151 months).

9

A sentence of 144 months would be substantially *higher* than the sentences in these cases, thus accounting for Mr. Nagi's criminal history score and any other aggravating factors. It would therefore comport with the statutory requirement to avoid unwarranted sentencing disparities. Notably, according to data from the United States Sentencing Commission's Interactive Data Analyzer, in the last five years, 65 percent of defendants in kidnapping cases in the Second Circuit received a sentence of fewer than 15 years.[4] Reaching back to the last ten years, 71.5 percent of defendants accused of kidnapping in the Second Circuit received such a sentence.[5]

*Second*, a substantial downward variance is warranted here because it is all but guaranteed that Mr. Nagi will be deported to Yemen following the completion of his prison sentence. He still suffers PTSD from his childhood there, and there is every indication the country conditions will be similarly awful when he returns, separated from his family. Such collateral consequences are a standard basis for a downward variance. *See generally United States v. Aguilar*, 133 F. Supp. 3d 468, 481 (E.D.N.Y. 2015).

*Finally*, if this Court were to somehow find, erroneously, that the alleged sex abuse actually occurred or that Mr. Nagi is required to register as a sex offender, the public knowledge of either will expose Mr. Nagi to extreme danger upon his deportation. Yemeni society is hostile to individuals accused of sex crimes, especially those involving same-sex sexual conduct. A recent report from the United States Department of State notes that the Yemeni penal code harshly criminalizes even consensual same-sex activity: "unmarried men shall be punished with 100 lashes of the whip or a maximum of one year of imprisonment, married men with death by stoning."[6] In January 2024, Amnesty International reported on a mass trial in a Houthi-controlled court in Yemen in which nine men were sentenced to death—seven by stoning and two by crucifixion—and 23 others were given prison sentences of up to ten years on charges of "homosexuality," spreading immorality," and "immoral acts."[7] In Ibb, the city where Mr. Nagi grew up, a court handed down death sentences to 13 male students and sentenced three others to flogging on charges of "spreading homosexuality" in February of last year.[8] Mr. Nagi risks a similar fate when he is forced to return to Yemen if he is marked, in error, as a sex offender.[9]

---

[4] United States Sentencing Commission, *Interactive Data Analyzer* (2025). https://ida.ussc.gov/analytics/saw.dll?Dashboard

[5] *Id.*

[6] United States Department of State, *2023 Country Reports on Human Rights Practices: Yemen* 53 (2023).

[7] Amnesty International, *The State of the World's Human Rights* 403 (2025).

[8] *Id.*

[9] In addition, SORNA's purpose is to "protect the public from sex offenders and offenders against children," a goal which will invariably be achieved by Mr. Nagi's deportation. 34 U.S.C. § 20901. It is unnecessary to impose SORNA registration requirements on an individual who will no longer be a member of the American public following his carceral sentence.

10

\* \* \*

      For the reasons discussed above, the Court should impose a sentence of 144 months, it should not find that the alleged sexual abuse occurred, and it should not impose a SORNA registration requirement in its judgment.

      Respectfully submitted,

      /s James Darrow

      James Darrow
        Assistant Federal Defender
      Karlton Tate
        Legal Intern
      Federal Defenders of New York, Inc.
      Tel. (718) 407-7419
      james_darrow@fd.org

      *Attorneys for Bilal Nagi*